T.C. Summary Opinion 2002-62

UNITED STATES TAX COURT

ROBERT LEE AND REBECCA WATERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11643-00S.                    Filed May 30, 2002.

Robert Lee Waters, pro se.

<u>Alexandra E. Nicholaides</u>, for respondent.


ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time that the petition was filed.[1]  The decision to be entered in this case is not reviewable by any other court, and this opinion should not be cited as authority.

--------

[1] All subsequent section references are to the Internal Revenue Code in effect for 1997, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' Federal income tax, an accuracy-related penalty, and an addition to tax for 1997 as follows:

|  |  | Penalty | Addition to tax |
| Year | Deficiency | Sec. 6662 | Sec. 6651(a)(1) |
| 1997 | $7,889 | $1,577.80 | $441 |

After concessions by petitioners,[2] the issues for decision are as follows:

(1) Whether for 1997, the taxable year in issue, petitioners are entitled to a deduction under section 165(c)(2) for a loss attributable to (a) the unauthorized removal of furnishings and fixtures from an apartment building in 1996 and (b) the foreclosure on such building in 1996.  We hold that they are not.

(2) Whether petitioners are liable for the accuracy-related penalty under section 6662(a) for negligence or intentional disregard of rules or regulations.  We hold that they are to the extent provided herein.

---

[2] In the petition, petitioners disputed the entire deficiency determined by respondent in the notice of deficiency. However, petitioners did not assign any error or allege any facts with respect to respondent's determinations regarding: (1) The receipt of unreported nonemployee compensation in the amount of $3,525; (2) the imposition of self-employment tax on such nonemployee compensation; and (3) the disallowance of itemized deductions for charitable contributions and unreimbursed employee expenses.  Moreover, at trial, petitioners did not dispute any of these adjustments.  Accordingly, we regard petitioners as having conceded these matters.

(3) Whether petitioners are liable for an addition to tax under section 6651(a)(1) for failure to timely file an income tax return. We hold that they are.

## Background

Some of the facts have been stipulated, and they are so found. Petitioners resided in Southfield, Michigan, at the time that their petition was filed with the Court.

### A. Petitioners

During 1997, the taxable year in issue, petitioner Robert Lee Waters (petitioner) was employed full-time as a teacher by the Board of Education of Detroit, Michigan. During that same year, petitioner Rebecca Waters was a housewife.

### B. Acquisition of the Hazelwood Property

In June 1986, a group of six individuals (the land contract vendees) purchased a parcel of improved real estate in Detroit, Michigan (the Hazelwood property), under a land contract. The land contract vendees included petitioners, petitioner's father, Marland and Dortha Moore, and Marland Moore's mother. The Hazelwood property consisted of a 38-unit, 4-story apartment building with an elevator. The memorandum of land contract that was recorded with the Register of Deeds for Wayne County, Michigan, did not disclose the purchase price of the Hazelwood property.

In March 1987, the land contract vendees received a warranty deed to the Hazelwood property. The warranty deed recites that the Hazelwood property was conveyed for the "full consideration" of $55,000.

In October 1988, Marland and Dortha Moore and Marland Moore's mother conveyed their interest in the Hazelwood property to petitioners and petitioner's father. According to the quit claim deed, the conveyance was for the "full consideration" of $50,000.

## C. Mortgage on the Hazelwood Property

In February 1990, a loan in the amount of $70,000 was obtained from First Independence National Bank of Detroit (First Independence). As security for the loan, petitioners and petitioner's father gave First Independence a mortgage on the Hazelwood property.

## D. Rental of the Hazelwood Property

In or about May 1994, petitioner[3] purportedly entered into a lease with a nonprofit housing corporation, operated by Reverend Jim Holley, which converted the Hazelwood property into a homeless shelter. This arrangement allegedly ended in February or March 1996, at which time petitioner took back possession of

---

[3] For the sake of convenience, we may sometimes refer to petitioner as the owner of the Hazelwood property even though petitioners and petitioner's father were the record owners of the property.

the building only to discover that "Everything had been trashed." In this regard, petitioner testified at trial as follows:

> And see, in these apartments I had 38 stoves, 38 refrigerators, and like that. All this was gone. When I came back there was no stoves, no refrigerators, no faucets, no shower heads, no knobs on the door. I mean everything. No light fixtures in the hall and whatever, and this is what I came back to and I had to try to refurbish.

Petitioner did not maintain insurance on the Hazelwood property, and at trial he made no mention of ever having filed any police report. Regardless, petitioner never pursued any recovery against either the nonprofit housing corporation or its operator because they were insolvent.

E.  Foreclosure and Mortgage Sale of the Hazelwood Property

As early as 1991, petitioner began having difficulty in making payments to First Independence. Indeed, in June 1991, First Independence filed a lis pendens with the Register of Deeds for Wayne County, Michigan.

Petitioner continued having difficulty in making payments to First Independence. In particular, petitioner did not make all payments in 1995, and he did not make any payment in 1996.

Foreclosure proceedings against the Hazelwood property were commenced by First Independence in 1996. The proceedings culminated on June 27, 1996, with a mortgage foreclosure sale.[4]

---

[4] The outstanding balance at that time was $70,686, consisting of principal of $58,148, interest of $11,214, and an
(continued...)

At that time, First Independence, as highest bidder with an offer of $50,000 at public auction, received a sheriff's deed dated June 27, 1996 (the sheriff's deed).

The sheriff's deed gave notice, in part, that "During the six months immediately following the sale, the property may be redeemed".

Neither petitioner nor petitioner Rebecca Waters nor petitioner's father redeemed the Hazelwood property.

In March 1997, First Independence conveyed the Hazelwood property by warranty deed to an unrelated third-party.

F.  Petitioners' Income Tax Return

On May 27, 1998, respondent received petitioners' U.S. Individual Income Tax Return, Form 1040, for 1997.  The return was signed by petitioners and dated April 28, 1998.  Petitioners did not apply for, or receive, any extension of time to file.

On their return, petitioners reported adjusted gross income of $64,806.99 and taxable income of zero.  Petitioners reported no tax liability and claimed a refund in the amount of the tax that had been withheld from petitioner's wages as a teacher.

Petitioners itemized their deductions for 1997.  In this regard, petitioners attached Schedule A, Itemized Deductions, to their return and claimed total itemized deductions of $311,514.

---

⁴(...continued)
escrow deficiency of $1,324.

Of this amount, $295,000 was claimed for a casualty or theft loss in respect of the Hazelwood property.

In support of their claimed casualty or theft loss, petitioners attached Form 4684, Casualties and Thefts, to their return. In Section B, Business and Income-Producing Property, petitioners computed their claimed loss as follows:

| | |
|---|---|
| Cost or adjusted basis | $300,000 |
| Less: insurance or other reimbursement | -0- |
| Fair market value before casualty/theft | 360,000 |
| Fair market value after casualty/theft | 65,000 |
| Diminution in fair market value | 295,000 |
| Lesser of: cost or adjusted basis or Diminution in fair market value | 295,000 |
| Casualty or theft loss | 295,000 |

## Discussion

### A. Loss Deduction[5]

#### 1. The Parties' Contentions

Petitioners contend they are entitled to a casualty or theft loss based on theft of the furnishings and fixtures of the Hazelwood property and the subsequent foreclosure on the property itself. Petitioners further contend that they are entitled to deduct the loss in 1997 because that was the year in which they surrendered possession of the Hazelwood property. In this regard, petitioners allege that after the foreclosure sale on

---

[5] We decide this issue without regard to the burden of proof. Accordingly, we need not decide whether the general rule of sec. 7491(a)(1) is applicable to this issue. See Higbee v. Commissioner, 116 T.C. 438 (2001).

June 27, 1996, they remained in possession of the Hazelwood property until mid-January 1997, when, for the first time since the foreclosure sale, they were contacted by First Independence and told that the bank would immediately take possession of the property.

Respondent acknowledges that a theft loss may be deductible, as may be a loss attributable to the foreclosure of property. However, respondent contends that any loss to which petitioners may be entitled is deductible in 1996, the year in which any theft was allegedly discovered and the year in which petitioners' equity of redemption was extinguished.

### 2. Deductibility of Losses, in General

As a general rule, section 165(a) allows as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. However, in the case of an individual, section 165(c) limits the deduction to: (1) Losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit; and (3) losses of property not connected with a trade or business or with a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.

A loss is "treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in

such taxable year." Sec. 1.165-1(d)(1), Income Tax Regs; see also sec. 1.165-1(b), Income Tax Regs. However, if there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of a loss with respect to which reimbursement may be received is "sustained" until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Sec. 1.165-1(d)(2)(i), Income Tax Regs.

### 3. Casualty and Theft Losses

Under section 165(a), a loss arising from theft is sustained during the taxable year in which the taxpayer discovers the loss. See sec. 165(e); sec. 1.165-1(d)(3), Income Tax Regs; sec. 1.165-8(a)(2), Income Tax Regs. The term theft includes, but is not limited to, larceny, embezzlement, and robbery. See sec. 1.165-8(d), Income Tax Regs. Whether a theft exists "depends upon the law of the jurisdiction wherein the particular loss occurred." Manteleone v. Commissioner, 34 T.C. 688, 692 (1960).

Petitioner urges us to find that the theft[6] of the furnishings and fixtures of the Hazelwood property occurred in 1997. At trial, however, petitioner candidly admitted that he discovered the loss of such furnishings and fixtures early in 1996 when he regained possession of the building from his tenant.

---

[6] In order to expedite our discussion, we shall accept that any unauthorized removal of furnishings and fixtures from the Hazelwood property constituted a theft under Michigan law.

Petitioner's testimony at trial graphically illustrates this admission:

> Q: Okay. But the damage occurred prior to '97. Correct?
>
> A: Yes.
>
> Q: And the foreclosure occurred in '96.
>
> A: It started -- yes.
>
> Q: Okay. So there was no event -- no damage or vandalization in '97 that gave rise to the loss?
>
> A: No. The rise to the loss happened in '96, not '97.

It is clear, therefore, that any casualty or theft loss that petitioner may have sustained from an unauthorized removal of furnishings and fixtures from the Hazelwood property was not sustained in 1997 but in an earlier year(s). See sec. 165(e); sec. 1.165-1(d)(3), Income Tax Regs; sec. 1.165-8(a)(2), Income Tax Regs. Thus, not only did petitioner discover the loss, at the latest, in February or March 1996, but no reasonable prospect of reimbursement existed at that time that would have served to defer recognition of the loss to 1997.

Equally unpersuasive is petitioners' related contention that the foreclosure of the Hazelwood property was tantamount to a casualty loss. Rather, the disposition of mortgaged property at a foreclosure sale is treated as a sale or exchange from which the mortgagor may realize gain or loss under section 1001. See

Helvering v. Hammel, 311 U.S. 504 (1941).  We therefore turn to that matter.

    4.  Foreclosure Loss

Petitioner contends that the foreclosure loss occurred in 1997 because "That's when the bank came and said: 'This is my building now'."  Respondent contends that the loss occurred in 1996, the year in which the period of redemption expired and the sheriff's deed became final.

In Michigan, the period of redemption from a foreclosure sale depends on a number of factors, including the type and size of the property, the date of the mortgage, and the amount of the debt owed.  As applicable herein, a 6-month period of redemption applies for mortgages executed on or after January 1, 1965, on multifamily residential property in excess of four units and not more than 3 acres in size if more than two-thirds of the mortgage debt remains outstanding.  Mich. Comp. Laws Ann. sec. 600.3240(7), (8) (West 2000).

Because the right to redeem is statutory, the redemption period may not be extended by a court, absent unusual circumstances such as fraud.  Flynn v. Korneffel, 451 Mich. 186, 207 (1996); see Cameron v. Adams, 31 Mich. 426, 428 (1875) (refusing to extend the redemption period despite the fact that the mortgagor had paid part of the redemption amount and a serious illness had prevented him from conducting his personal

business during the redemption period).

When the redemption period expires, both legal title and the right to possession vest in the purchaser. Mich. Comp. Laws Ann. sec. 600.3236 (West 2000); <u>Bankers Trust Co. v. Rose</u>, 322 Mich. 256, 259 (1948); <u>Shelby Co. v. Dickinson</u>, 259 Mich. 197, 198 (1932). Possession of the property by the mortgagor after the redemption period expires is unlawful, and no notice to quit is necessary. <u>Shelby Co. v. Dickinson</u>, <u>supra</u>.

In view of the foregoing, it is clear that upon the expiration of the 6-month redemption period on December 27, 1996, petitioner no longer had any ownership right or possessory interest in the Hazelwood property. Equally clear is the fact that any delay by First Independence to take actual possession of the property is without legal consequence. Thus, by virtue of Michigan law, any loss that petitioner may have sustained from the foreclosure on the Hazelwood property was sustained in 1996, the year in which petitioner's equity of redemption was extinguished. See sec. 1.165-1(d)(1), Income Tax Regs; see also sec. 1.165-1(b), Income Tax Regs.

5. <u>Conclusion</u>

Because no loss was sustained in 1997, the only taxable year before the Court, we hold that the deduction in issue is not allowable for that year.

B.  Accuracy-related Penalty

Next, we consider whether petitioners are liable for the accuracy-related penalty under section 6662(a).

Section 6662(a) and (b)(1) provides that if any portion of an underpayment of tax is attributable to negligence or disregard of rules or regulations, then there shall be added to the tax an amount equal to 20 percent of the amount of the underpayment that is so attributable.  The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c); see sec. 1.6662-3(b)(2), Income Tax Regs.   However, no penalty shall be imposed with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c).

Applicable to court proceedings arising in connection with examinations commencing after July 22, 1998, section 7491(c) places on the Commissioner the burden of production with respect to a taxpayer's liability for any penalty or addition to tax. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(a), (c)(1), 112 Stat. 685, 726, 727.  However, the taxpayer still bears the burden of proving that the negligence penalty is inapplicable.  Rule 142(a);

INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

As we see it, the principal issue in this case involves an issue of timing; i.e., the year in which a loss may properly be deducted. We have decided that issue in respondent's favor. However, we can appreciate how petitioner might have concluded that the foreclosure of the Hazelwood property was not complete until January 1997, since that is when he apparently surrendered possession of the property. Similarly, although petitioner may have discovered the unauthorized removal of furnishings and fixtures in 1996, we can appreciate how he might have concluded that such removal was inextricably connected with the ultimate fate of the Hazelwood property, which, at the time, was either in or on the verge of foreclosure proceedings.

In view of the foregoing, we do not sustain respondent's determination of the penalty under section 6662(a) to the extent that the underpayment of tax in this case is attributable to the loss deduction under section 165(c)(2).

In contrast, we sustain respondent's determination of the penalty under section 6662(a) to the extent that the underpayment of tax in this case is attributable to the adjustments conceded by petitioners. See supra note 2. In this regard, we observe that a taxpayer's failure to keep adequate books and records or

to properly substantiate items constitutes negligence. Sec. 1.6662-3(b)(1), Income Tax Regs. In addition, negligence is strongly indicated where a taxpayer fails to include on an income tax return an amount of income shown on an information return. Sec. 1.6662-3(b)(1)(i), Income Tax Regs.

## C. Addition To Tax Under Section 6651(a)(1)

Finally, we consider whether petitioners are liable for an addition to tax under section 6651(a)(1).

Section 6651(a)(1) imposes an addition to tax for failure to timely file an income tax return. The addition to tax may be avoided if the failure to timely file is due to reasonable cause and not willful neglect. "Reasonable cause" contemplates that the taxpayer exercised ordinary business care and prudence and was nonetheless unable to file a return within the prescribed time. United States v. Boyle, 469 U.S. 241, 246 (1985); sec. 301.6651-1(c)(1), Proced. & Admin. Regs. "Willful neglect" means a conscious, intentional failure or reckless indifference. United States v. Boyle, supra at 245.

Section 7491(c) places on the Commissioner the burden of production with respect to a taxpayer's liability for any penalty or addition to tax. However, as previously mentioned, the taxpayer still has the burden of proving that the Commissioner's determination of the addition to tax is erroneous. Rule 142(a); INDOPCO, Inc. v. Commissioner, supra; Welch v. Helvering, supra;

Higbee v. Commissioner, supra; BJR Corp. v. Commissioner, 67 T.C. 111, 131 (1976); Bebb v. Commissioner, 36 T.C. 170 (1961).

Absent an extension of time to file, petitioners' 1997 income tax return was required to be filed by Wednesday, April 15, 1998. See sec. 6072(a). However, petitioners did not apply for, or receive, any extension of time to file, and their tax return (bearing their signatures and the date of April 28, 1998) was not received by respondent until May 27, 1998. Such evidence satisfies respondent's burden of production under section 7491(c).

At trial, petitioners did not introduce any evidence regarding reasonable cause or lack of willful neglect. Indeed, apart from arguing that there is no deficiency in income tax, petitioners have not argued that they should be excused from liability for the addition to tax. Finally, there is nothing in the record to suggest that petitioners' failure to timely file was due to reasonable cause and not willful neglect. Accordingly, we sustain respondent's determination on this issue.

## D. Conclusion

Reviewed and adopted as the report of the Small Tax Case Division.

To give effect to our disposition of the disputed issues, as well as petitioners' concessions, see <u>supra</u> note 2,

<u>Decision will be entered</u><br><u>under Rule 155</u>.